UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

CURTIS RIAS,

                              Plaintiff,

- against -

CITY UNIVERSITY OF NEW YORK,
PASQUALE MORENA, CARLOS SUAREZ,
ANTHONY LAPERUTA, ROBERT CURRY,
JOHN SIDERAKIS, DENISE DYCE and
DAVID ROBINSON

                              Defendants.

--------------------------------------------------------X

**1:18-cv-06883-KPF**

**AMENDED COMPLAINT**

**PLAINTIFF DEMANDS A
TRIAL BY JURY**

Plaintiff Curtis Rias ("Rias" or "Plaintiff"), by his attorneys, Jasper & Jasper, PLLC, complaining of City University of New York ("CUNY"), Pasquale Morena ("Morena"), Carlos Suarez ("Suarez"), Anthony Laperuta ("Laperuta"), John Siderakis ("Siderakis"), Denise Dyce ("Dyce"), David Robinson ("Robinson") (collectively "Individual Defendants", collectively with CUNY "Defendants"), alleges:

<u>**NATURE OF CLAIMS**</u>

1.      Rias was subjected to unlawful retaliation in response to his internal complaints of discriminatory treatment in his employment with City College of New York ("City College"), a member institution of the CUNY university system of the City of New York, based on his race, color, perceived national origin, sex/gender expression, perceived sexual orientation and familial status.

2.      Rias is an unmarried, single man of African American and Hispanic descent.  He has worked as an IT professional with CUNY for approximately 27 years.

1

3.      In or about 2015 he was transferred to the City College department of Public Safety where, for approximately 18 months, he was subjected to a continuously hostile work environment and regular, unlawful harassment by Morena, Suarez, Laperuta, Curry and Marquez, among others.

4.      In May and June of 2016, he made internal complaints to CUNY, regarding his unlawful and discriminatory treatment in Public Safety, more specifically concerning his being subjected to a harassing and discriminatory environment, including constant racial epithets, sexist and homophobic comments, utterances of threatening and intimidating remarks towards him by other, armed, Public Safety employees, and witnessing censures and investigations of others that were clearly racially motivated.

5.      Along with his internal complaints, he also asked to be transferred from Public Safety. After making his complaints to, among others, Siderakis and Dyce, Rias was counseled by Siderakis and Dyce to take leave from work, purportedly while his complaints were being investigated.

6.      In violation of CUNY's stated policy, no investigation was ever undertaken, but instead, when Plaintiff returned from leave in September 2016, he was demoted, returned to work in a new position – a position of lesser status, lesser responsibility and substandard working conditions.  This demotion, to an under-resourced position, in a department with a history of poor retention, was an attempt to subject Rias to the risk of termination, or to force Rias to resign from CUNY, in further retaliation for his complaints in May and June 2016.

7.      While in this new assignment, Rias was supervised and treated differently than other employees with similar job duties and responsibilities, and the other employees in his department.  His movements and work assignments were closely monitored, he was penalized

2

with an unauthorized wage deduction for alleged improper leave, and he suffered physical and emotional damage as a result of the deliberately inhospitable and unwelcoming environment.

8.    This proceeding is brought to remedy discrimination against Rias by Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e, *et seq.* ("Title VII"); Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-d, *et seq.* ("Title VI"); Title IX of the Educational Amendments Act of 1972, as amended 20 U.S.C. §§ 1681, *et seq.* ("Title IX"); the Civil Rights Act of 1866, as amended U.S.C. § 1981 ("Section 1981"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law, Executive Law§ 290, *et seq.* (the "Executive Law"); and the New York City Administrative Code, § 8-101, *et seq.* (the "City Law").

9.    Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated, and punitive damages, and other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as the claims herein arise under federal law.   The Court has supplemental jurisdiction over the claims brought under the Executive Law and the City Law, pursuant to 28 U.S.C. §§ 1367, as the remaining claims are so related that they form a part of the same case or controversy.

11.    On or about January 13, 2017, Plaintiff filed a charge of discrimination against CUNY with the United States Equal Opportunity Employment Commission (the "EEOC").   Pursuant to a work sharing agreement, a copy was also filed with the New York State Division of Human Rights.

12.     On or about May 1, 2018, the EEOC issued a Notice of Right to Sue, issued on Plaintiff's request, postmarked May 4, 2018 and received on May 11, 2018.  A true copy is annexed hereto as Exhibit A.

13.     Accordingly, Plaintiff's complaint herein has satisfied all administrative conditions and is timely.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York; additionally the parties are located within the State in which the district is located.

### PARTIES

15.     Rias is a natural person living in the State and County of New York.  He has worked for CUNY as an Information Technology professional for approximately 27 years.

16.     Rias is a man of African-American and Hispanic descent.  He is unmarried, single, and without children.

17.     Defendant CUNY is a publicly-funded university system, comprised of senior and community colleges, graduate and professional schools, research centers, institutes and consortia.  Its headquarters and principal place of business is New York City, New York.  Upon information and belief, and at all times relevant hereto, CUNY received and continues to receive federal financial assistance.

18.     Defendant Pasquale Morena was, at all relevant times, the Executive Director of Public Safety & Security at City College.  At relevant times, Morena carried a firearm.

19.     Defendant Carlos Suarez was, at all relevant times, an officer in the Department of Public Safety for City College.  At relevant times, Suarez carried a firearm.

20.     Defendant Anthony Laperuta was, at all relevant times, an Investigation Special Operations Lieutenant/Assistant Director of Public Safety & Security at City College. At relevant times, Laperuta carried a firearm.

21.     Defendant Robert Curry was, at all relevant times, the Operations Lieutenant/Assistant Director of Public Safety & Security at City College.  At relevant times, Curry carried a firearm.

22.     Defendant John Siderakis was, at all relevant times, the Assistant Vice President of Human Resources for City College.

23.     Defendant Denise Dyce was, at all relevant times, the Director of Labor Relations for City College.

24.     Defendant David Robinson was, at all relevant times, Assistant Vice President of Facilities for City College.

## FACTUAL ALLEGATIONS

25.     In or about February of 2015 and, on information and belief, under the pretense of several CUNY-wide realignments of non-faculty resources to prepare for two newly-constructed buildings to be brought online, Rias was reassigned from City College's Information Technology Department to its Office of Public Safety ("Public Safety").

26.     Around this same time, officers in Public Safety began to be authorized to carry guns in connection with their duty on City College's campus.

27.     The use and tolerance for racist, emasculating and homophobic verbiage and behavior in Public Safety was the norm.  The clearly pervasive policy, as exhibited in Public Safety, was, at best, an attitude of indifference to the many faculty, staff and students of color, in their charge (the campus student population is overwhelmingly persons of color).

28.     From the beginning and throughout his time in Public Safety, Rias witnessed numerous, daily instances of harassing and discriminatory language, from his department's supervisors and his colleagues, and directed at the above-mentioned faculty, staff and students of color.  For example, Lt. Robert Curry said "We need to have some younger looking pussy in here.  Look at all this old-ass pussy we have around here," about Melody Davis and Diane Jacobs, two African-American women, who had worked for Public Safety for many years, were eventually transferred to Human Resources offices, and were replaced with two apparently younger African-American and Hispanic-American women.  Around the same time, when George Ranalli, former Dean of Architecture had been accused of sexually harassing a female student, Ariella Campisi, a Public Safety officer said, "How could they want to fire the dean, it is not like he fucked that little girl."

29.     These were not isolated incidents and the hostile climate continued.  For example, on or about January 8, 2016, Rias received a complaint about an available wi-fi network device in Baskerville Hall, which housed both City College programs and high school students' programs, and which had been re-named "I hate niggers" on the SSID (the list broadcast to computers and other devices, with the names of networks in their areas that users might connect to.)  When the Executive Director of Public Safety, Pasquale Morena, learned that Rias was investigating the incident, he complained about the time being spent for the investigation, and asked, "Is this really that serious?"

30.     On or about March 2, 2016, Officer Carlos Suarez, armed with his service weapon, approached Rias from behind, as Rias was speaking with Officer Johnny Rojaschicaiza.  Officer Suarez then grabbed Rias' arm and made the following comment: "You are under arrest, you fucking faggot, and please assume the position or I will shoot!"

31.     After a few minutes of trying to calm himself down during this period, Rias made his way back to his office.

32.     As he was walking away and passing next to the TV monitor in the center part of the office, Rias could hear the officers laughing about the incident, with Suarez commenting to Officer Rojaschicaiza, "Oh, I scared the shit out of him," and Rias observed Officer Rojaschicaiza nod with approval, as Officer Timothy Gramphrey, who was seated at a computer nearby, continued to laugh.  This incident was captured on security video.  As is visually apparent in the video, Rias was clearly shaken by what was said to him and the way Officer Suarez grabbed him.

33.     On several occasions through 2016, Lt. Laperuta said "What the fuck does that faggot-ass George want now" referring to George Reinhardt, Director of Student Affairs and support services for students at City College, who would regularly stop by the Public Safety department to deal with student-related issues involving Public Safety and Public Safety officers.  Lt. Laperuta also repeatedly said "I believe that guy Kern is a fag", referring to Kern Williams, City College's Director of Student Housing/Dormitory.  After one visit by Mr. Williams, Laperuta commented, "I think he's a fag, what do you think?  He was doing a BBQ outing with a bunch of his boys next to the dorm one day and we had to check them."  Similarly, "That nigger ain't worth shit" and "Fuck that faggot-ass nigger" were adages commonly used by Lt. Robert Curry to express annoyance, frustration or dissatisfaction with numerous staff, faculty or students.

34.     Rias was also the direct victim of these verbal assaults.  For example, Marquez openly referred to him as "That uppity worthless nigger, thinks he too good to take a class dealing with alarms."  Similarly, Suarez referred to Rias as "a lazy-ass nigger who should be fired or forced to retire."

35.     In addition to being subjected to an environment of constant derogatory and racist language, Rias was questioned about a number of staff and faculty members' sexuality or perceived sexuality, on a regular basis, clearly as a means of determining Rias' sexuality or interest.  Rias' resistance to, or refusal to, respond to such questioning, was met with derision and further harassing comments.

36.     Rias was encouraged by his supervisors to participate in many public events, including external activities of law enforcement and political groups.  During many of these interactions, Rias was subjected to further derogatory language about black or homosexual public figures, both of which types of individuals were constantly identified as being favored by, or like, Rias. As was the practice in the office, homophobic epithets were used to impugn the masculinity or femininity of the criticized public officials.

37.     Rias grew increasingly uncomfortable with what he was witnessing, and attempted to withdraw from social interaction within Public Safety.   Nevertheless, he was constantly pressured to interact socially, and was required to demonstrate his loyalty to the department with activities such as videotaping/photographing campus protests, attending law enforcement funerals and other outings.

38.     As Rias' discomfort became apparent, he became the target of increasing harassing behavior and of endless office jokes about his attire, including innuendo about his perceived sexual orientation, marital status and absence of children.  Executive Director Morena joked openly about requesting that Rias retrieve lunch for him.  Rias felt he had no choice but to perform these demeaning tasks, to prevent further harassment and further adverse employment consequences.

39.     Innuendo about violence against people of color and homosexual sex acts were common-place.  During one of Executive Director Morena's many, impromptu meetings, the issue of weapons training and sponsorship for weapon assignment came up.  The conversation turned towards Lt. George Crinnion being sponsored for a gun license (of all the senior officers, Crinnion was, at that time, the only one who was not armed).  In the presence of Rias, Curry and Laperuta, Morena said, "Oh, if [Lt. Crinnion] was to receive a gun, he would most likely shoot Curtis in the ass."

40.     The use of intimidation and degrading language evidenced a hostile environment, where racially tinged intimidation, and denigration of the sexual or gender identity of men and women was the norm in Public Safety.

41.     During many conversations with other officers, Lt. Laperuta repeatedly chided, "Once I get that fucking faggot in Rias' hand, I will make sure to tune-his-ass-up."  On one occasion, in the Public Safety offices, Rias witnessed an African-American student being interviewed about a stolen laptop.  As the student got up to leave, the officers involved decided to "tune-him-up" and wrestled the student to the ground.  When they noticed Rias watching, they closed the inter-office door to where the interview was being conducted to block his view.

42.     On or about May 24, 2016, Rias made an appointment with City College's Office of Human Resources ("HR"), to complain about this intimidation and harassment.  HR scheduled a meeting on May 27, 2016.

43.     Rias Complained to HR about the discriminatory and hostile work environment.

44.     At the time of Rias' complaint, CUNY did not have in-place a mechanism whereby aggrieved staff were able to make, in confidence, inquiries about and/or lodge complaints

regarding, allegations of unlawful misconduct and discrimination, with regards to Public Safety officials and its staff.

45.     Thus, Rias was careful to focus on describing the environment without mentioning anyone by name in his initial meeting for fear that his concerns would be shared with the armed Public Safety personnel, who he was accusing of unlawful harassment, and with whom he would be continuing to work.

46.     Rias described the language and conduct that he was witnessing, without attribution. Following Rias' complaint, he was immediately thereafter subjected to escalating unlawful harassment, and false criticism about his alleged absenteeism and inattention to duty, occasioned by, based on information and belief, the fact that Rias' initial complaint was shared with the Office of Public Safety's senior staff members.

47.     On several occasions, immediately after his initial complaint, Curry and Officer Suarez gave Rias menacing looks, while adjusting their gun belts or attempting re-holster their weapons (which were drawn for no apparent reason), whenever Rias walked into to their office.  On one occasion, Laperuta was standing outside Rias' closed office door and, as he went to open the door to exit his office, Laperuta grabbed his weapon, as if he were about to shoot Rias.

48.     This conduct would persist.  For example, on or about the morning of October 27, 2017, Rias, who lives several blocks from City College, was trailed from his apartment to work by Laperuta in an unmarked, City College, partrol car.  As Laperuta pursued Rias, he rolled down the driver-side window and leaned out the window, thus ensuring that Rias was able to see who was pursuing him.  At one point, stopped at a traffic light, Laperuta motioned his right arm as if he was adjusting something on his waistband.  As the traffic light changed to green, Laperuta

didn't proceed but rather waited approximately 15 to 20 seconds.  Laperuta then proceeded slowly up the street ahead of Rias, who, at this point, was in complete shock and fear.

49.     In the wake of the occasion, where Laperuta grabbed his weapon, as if he were about to shoot Rias, as described *supra,* Rias scheduled a second meeting with HR to further advance his complaint in June 2016.

50.     During the second meeting with the Assistant Vice President of Human Resources, John Siderakis, and Denise Dyce, Director of Labor Relations, on or about June 21, 2016, Rias described in further detail multiple incidents of abuse and harassment involving Public Safety officers, like those described *supra*.

51.     Among the incidents that Rias recounted in the meeting, was his being grabbed by Suarez in March 2016, the incident that was documented by video.  Rias offered the video of this event to Siderakis and Dyce during their June 2016 meeting.

52.     They both declined to view the video, and neither accepted a copy in the meeting or thereafter.  Dyce indicated that an outside agency or agencies would have to conduct an investigation at some point in the future, and that the video should be handed over to that agency or agencies at that time.

53.     Siderakis asked Rias if there was audio on the video to substantiate his allegations of what was said on the video.  Rias explained that the video, which is security surveillance footage, does not include audio.  Rias asked again that they view the video.  Again, they both declined.

54.     Rias was surprised that his offer of the video was declined; not only was CUNY apparently disregarding his claims that such endemic harassment had an illegal discriminatory

motive, but it also was a clear violation of CUNY's policy prohibiting workplace violence, which is applicable to all of its employees as a condition of employment.

55.    Another example of conduct Rias complained about during his second meeting with HR was an effort by Public Safety, together with the Facilities department, to study alleged time-clock abuse by some of the CUNY's custodial employees.  The study was done at the request of the Assistant VP of Facilities, David Robinson.   The Facilities department had become suspicious of time-clock misuse occurring among some of the custodial workers.  To confirm its suspicion, the Public Safety department placed a hidden video camera next to time-clocks to monitor staff punching in and out for work.

56.    After several weeks of reviewing time-clock use by some custodial staff members, Public Safety decided to arrest approximately 5 custodial workers, all of whom were of African-American or Hispanic descent.  On information and belief, these workers were then taken to the local precinct and booked by the police.  Although Rias tried to avoid being around officers, who were armed and located in the central Public Safety office, during one unavoidable exchange with Morena, Morena commented that HR was doing a horrible job of hiring criminals and thugs.  Rias asked why the custodial staff were arrested.  Director Morena response was "theft of service."   Morena went on to comment that the arrested custodial staff complained that a large section of other mostly-white staff had been using time-clocks in the same manner.   In explaining why the custodial workers (as opposed to other staff), had been the subject of the time-clock investigation, Director Morena then added, "Well, you know, 'they' -- referring to Black and Hispanic employees -- always make it easy for us."

57.    During the second, meeting with HR, Rias requested a transfer to work in a different environment that was not hostile and overtly discriminatory, and reassignment to his original

functions in Information Technology as Senior Director of Instructional Technology and Media Support Services, or its equivalent.

58.     Rias complained that Public Safety – which by then had several officers who carried guns issued by CUNY – was being run more like a wild police department, where officers were abusing their authority and using their status as newly armed enforcers to harass and intimidate students, faculty and staff, particularly people of color and other minorities.

59.     Rias made it very clear that he didn't feel safe returning to Public Safety office area as he thought some of the officers would retaliate against him, once an investigation was initiated.

60.     At some point, Dyce, without any request by Rias, or any indication that such leave was medically appropriate, recommended that Rias take Family Medical Leave (FMLA), until his complaint could be resolved.

61.     Dyce also indicated during the meeting that CUNY had received several complaints concerning Officer Suarez and was "well aware" of his behavior.

62.     While, Rias was reluctant to take FMLA leave, he acknowledged to himself that his health and safety were more important than being on campus, while an investigation was being conducted.

63.     Accordingly, he consulted a physician, who confirmed that a leave would be appropriate. The doctor diagnosed new, negative health indicators, which he attributed to the stress Rias was experiencing as a direct result of the workplace harassment.  The doctor also recommended that Rias seek counseling – also for the first time in his life – related to his work experience.

64.     Rias took FMLA leave from June 30, 2016 until September 13, 2016.

65.     Although Rias periodically checked in with CUNY regarding his medically prescribed regimen, and expectations of his return to full duty, at no time during the period of his FMLA

leave did anyone from CUNY contact him, or otherwise communicate with him, regarding the investigation related to his complaint that was purportedly taking place during his absence.

66.     Rias never received any follow-up regarding his complaint.  The only communication he received was the letter from CUNY, regarding his demotion (denominated as a "transfer"), upon his return from FMLA leave.

67.     On information and belief, no investigation of Rias complaint has ever been conducted by CUNY.

68.     On information and belief, the failure to follow through with an appropriate investigation is a routine departure from stated CUNY policy, and internal investigations into the improper handling of discriminatory and hostile workplace complaints have not been undertaken.

69.     Before returning from FMLA leave, Rias received a letter from HR, dated September 7, 2016, reassigning him to work in the Facilities Department ("Facilities") at City College.  This transfer, which was a demotion, was in retaliation for Rias' complaint made immediately before his leave, which leave was suggested and recommended by HR.

70.     The letter also stated that he would report to the to the Assistant Vice President of Facilities' executive assistant, a person who, on information and belief, was an administrative clerical worker, with no IT responsibilities or experience, and no management responsibilities or experience.

71.     Rias knew immediately that the demoted position was one in which he would not, and likely could not, utilize his skills acquired from working in information technology for over 25 years.

72.     While Rias retained the same salary, as described *infra*, he has been given inferior working resources, has no defined job duties, and was unequipped with basic resources to meet any information technology needs.

73.     Nevertheless, at the time, Rias accepted the reassignment and reluctantly moved to Facilities.  Immediately upon his return to work, Plaintiff reported to his new assignment, as directed, and continued to work there.

74.     Among other reasons for his concern, Rias was apprehensive regarding a move to Facilities, which is infamous within the City College and CUNY communities for high employee turnover.

75.     On information and belief, in recent years, Facilities had forced out approximately six staff members, primarily due to their ethnic or racial background.

76.     Several colleagues warned Rias that he was being assigned to Facilities in order to manage him out of CUNY's organization, either through fostering an environment sufficiently uncomfortable so that he'd be encouraged/likely to resign; or, by assigning vague tasks, supported by resources that were inadequate to permit effective completion of the obscure task, and then alleging Rias' incompetence when he failed to complete the work assignment.

77.     Before Rias' unorthodox assignment to the Facilities department, on information and belief, the department had never had an Information Technology professional, or even an entry-level IT technician, assigned to it.

78.     All other administrative departments at CUNY's various schools, support for IT services are handled by the Information Technology department's central support services, which has a Call Center/Helpdesk for this very purpose.

79.     Previously, City College followed a policy of assigning all Information Technology personnel to the department of Information Technology.  While day-to-day duties and responsibilities are performed throughout all of the various academic departments, all IT staff report directly to the department of Information Technology.  This policy is meant to ensure that all personnel serving within Information Technology or assigned Computer-related titles, are properly dispatched, evaluated, and managed.

80.     Rather, than following the usual, organizational protocol, with respect to the assignment of IT professionals, after returning from his FMLA leave that followed his complaint, as described *supra,* Rias was required to report to an administrative assistant, without any professional experience or organizational connection to IT or the IT department.

81.     Uncertain of how to respond to this change, Rias requested an organizational chart from CUNY during this transfer period but was never provided one.

82.     Subsequently, Rias no longer participated in department-wide communications, intended for all IT personnel and, on information and belief, was instead slotted into a non-existent position, with the intention of easing him out of CUNY's employ, in retaliation for his complaint about a discriminatory and hostile work environment.

83.     On information and belief, IT assignments are documented through a centralized work ticketing system in which all IT staff members have access to track their work assignment and the progress being made on such assignments.  Rias does not have access to this system -- a system that would allow him to properly document his assigned tasks -- nor is he able to track his work assignments.  Accordingly, he cannot receive, track, document or measure his IT work assignments, in a manner consistent with CUNY's practice, thus rendering his remaining IT work all but entirely undocumented.

84.     On information and belief, Rias is the only IT professional at City College to be reassigned in this manner, and whose work is not reflected in Defendant's ticketing system.

85.     Increasingly, Rias' work assignments are entirely clerical in nature.  For example, he regularly performs data entry of repair tickets for elevator and escalator repairs into a spreadsheet, which is submitted on weekly basis to higher level administrators within the Facilities department.  Since his demotion to Facilities, the Facilities department has hired additional staff, who also perform similar work to Rias and all of whom have explicit clerical titles, duties and responsibilities, other than -- and not -- IT.

86.     During his time in Facilities, there have been numerous work assignments, emails and policies, which have only been directed at Rias.

87.     For example, he was not allowed to use personally assigned vacation (unscheduled), time which is issued by CUNY, as part of a contractual agreement with all full-time staff, and based on past practice of use of personal time, within the department of Information Technology. Rather, Rias is required to provide written requests, indicating when he intends to be out of the office and the purpose of his leave.

88.     If Rias takes an extended break for personal reasons (bathroom, medical, etc.), he must request permission.  Rias is not allowed to take any breaks from his desk at any time to attend any CUNY functions elsewhere on the campus.  He is required to provide a weekly calendar of his work week to the office staff.

89.     Plaintiff's movements have been unreasonably monitored, including being followed to the restroom and being asked to give notice anytime that he was away from his desk, including to use the restroom or to get water.  On information and belief, this was done at the express direction of Robinson.

90.     Plaintiff's time and leave were reviewed, and he was disgorged paid leave he had used on the pretext that it had not been previously authorized, notwithstanding that he had provided notice of the leave.   On information and belief, this was done at the express direction of Robinson.

91.     Plaintiff suffered wage deductions that were not statutorily authorized, and which were retaliatory.

92.     Whereas Rias previously had a private office, his desk in Facilities was located in a common area, next to a hot and loud heater.   It was within a foot of the side of the office's large volume copier/printer, where over 20 staff members print out large volumes of documents throughout the day.   On information and belief, this location assignment was determined by Robinson.

93.     Plaintiff was denied proper working space, and he was not afforded a place to keep any personal belonging, resulting in his phone being stolen from the common area where he was assigned to work.   Rias received a complaint for reporting the theft.   Robinson publicly discussed this matter in the reception area of the department and yelled out "oh she hung him or we hung him, we finally hung him", referring to Rias.

94.     Not only did other employees regularly using his work space as a place to organize their documents and print jobs, but the machine vented heat, toner and chemical vapors all day onto Rias' desk.   His desk was also near the radio used to dispatch Facilities personnel to needed repair/maintenance areas, with constant noise throughout the day, as it's used to contact tradesmen and assign them to jobs.

95.     Rias was no longer afforded the resources necessary to perform IT work, even when it is requested of him in his new, undefined job.

96.     Rias previously had administrative access rights to CUNY's computer systems, which he was responsible for supporting in his past assignments.  In this new role, his computer systems' access had been revoked.  This lack of access sharply limited Plaintiff's ability to perform information technology-related work.

97.     Rias was assigned a computer that is at least 10 years older than the rest of the staffs' computers, without applications, software and other system resources necessary for an IT position.  While Rias made a written request for access to his old desktop computer, in or about November 2016, to retrieve some personal files, office related information, and to recover some possible E-discovery files related to various cases, he finally received a response in late March 2017, denying his request and reporting that the computer had been reimaged and reissued within his former department, Public Safety.

98.     Rather than ensuring that Rias received the appropriate equipment to satisfy his job duties, Robinson was responsible for ensuring the environment in Facilities was hostile and retaliatory.  For example, Robinson did not get Rias an appropriate computer, he denied Rias keys to the office, limited Rias' systems access, although Rias was nominally an IT professional, directed the hyper monitoring of Rias' routine movements within the office, and failed to respond to Rias' requests for an supportive resources, or even a job description of what he was expected to do.

99.     Additionally, Robinson made racially charged comments in the office.  For example, on one occasion, in or about late March or early April 2018, he brought bananas to work offered them to the African American and Hispanic women in the office, whose staff was entirely people of apparent African American and Hispanic descent. When one of the administrative staff

members said she didn't like bananas, he retorted that he thought everyone in the office liked bananas.

100.    Rias resorted to bringing in his own laptop in order to be able to complete the most basic of his assigned IT tasks.

101.    On several occasions, he was forced to reach out to other IT staff members, outside of his department, to provide assistance with IT tasks and assignments within his own department, because he lacked the appropriate resources and access to meet the instant technology needs.

102.    His responses, *i.e.*, having to refer out requests arising within his department, as described *supra*, have been met with frustration by staff within his department, seeking his IT services, and has created recent, negative perceptions about Rias' work and skills, which are entirely unwarranted.

103.    For the first time, Rias received adverse feedback about the quality of his work.

104.    Simultaneously, the severe stress of his working conditions, imposed in retaliation for his complaint about a discriminatory and hostile work environment, caused Plaintiff to suffer serious health problems.

105.    Following hospitalization, including a medical emergency that arose while at work, Rias was improperly chastised about his absence and his medical needs.

106.    Rias was forced to request a medical accommodation in his working environment.  On information and belief, this process was delayed and mishandled in retaliation for Rias filing a complaint with the EEOC.

107.    Following assignment to Facilities, Plaintiff requested his job description.  Rias finally received a job description in or about May 2018, during the course of his push for a medical accommodation, for conditions that had arisen as a direct result of his work environment.

108.    Notably, the job description that he received requires him to work closely and almost exclusively with the IT dept in order to accomplish and complete his job functions described, and did not include any of the clerical tasks he had been handling for the nearly 2 years, prior to his finally receiving the job description.  However, the finally proffered job description did include, instead, the IT duties for which he was not given adequate hardware, software or clearances.

## FIRST CLAIM FOR RELIEF

### [*as against CUNY*]

### [Race, Color, Perceived National Origin, Sex/Gender Expression and Perceived Sexual Orientation Discrimination in Violation of Title VII]

109.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

110.    Plaintiff is a man of African-American and Hispanic descent and is thus a member of a protected class under Title VII based on his race, color, perceived national origin, sex/gender expression and perceived sexual orientation.

111.    CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Rias on the basis of his race, color, perceived national origin, sex/gender expression and perceived sexual orientation.

112.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

113.    CUNY knew that its actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutory rights.

114.    As a direct and proximate result of CUNY's conduct in violation of Title VII, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages

for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

115.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SECOND CLAIM FOR RELIEF

### [*as against CUNY*]

**[Hostile Work Environment Based on Race, Color, Perceived National Origin, Sex/Gender Expression and Perceived Sexual Orientation in Violation of Title VII]**

116.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of his work environment during his employment with CUNY.

118.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, in violation of Title VII.

119.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of

reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

120.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## THIRD CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title VII]

121.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

122.    Pursuant to the acts and practices of CUNY as alleged above, Plaintiff made several complaints to his supervisors and to CUNY's HR staff, of the discrimination based on his race, ethnicity and gender/gender expression, and thus, was engaging in a protected activity pursuant to Title VII.

123.    CUNY knew or should have known of the unlawful acts and practices as the same, yet failed to act promptly to prevent or end the harassment and discrimination, and instead knowingly permitted it to continue in retaliation for Plaintiff opposing discriminatory behavior.

124.    Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that he suffered and the hostile work environment that was created thereby.  CUNY, then forced Plaintiff to take leave, demoted him and subjected him to an antagonistic and inhospitable work assignment as retaliation for making an internal complaint about discrimination and then filing a claim with the EEOC, in violation of Title VII.

125.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

126.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FOURTH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Race, Color and Perceived National Origin Discrimination in Violation of Title VI]

127.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

128.    The Plaintiff is of African-American and Hispanic descent and is thus a member of a protected class under Title VI based on his race, color and perceived national origin.

129.    On information and belief, and at all times relevant hereto, CUNY received, and continues to receive, federal financial assistance.

130.    CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Rias on the basis of his race, color and/or perceived national origin.

131.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

132.    CUNY knew that its actions constituted unlawful discrimination, showed deliberate indifference and/or reckless disregard for Plaintiff's statutory rights.

133.    As a direct and proximate result of CUNY's conduct in violation of Title VI, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

134.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, Defendant should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FIFTH CLAIM FOR RELIEF

### [Hostile Work Environment Based on Race, Color and Perceived National Origin in Violation of Title VI]

135.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

136.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of his work environment during his employment with CUNY.

137.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, showing deliberate indifference and/or reckless disregard for Plaintiff's statutory rights, in violation of Title VI.

138.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

139.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SIXTH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title VI]

140.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

141.    Pursuant to the acts and practices of Defendant as alleged above, Plaintiff made several complaints to his supervisors and to Defendant's HR staff, of the discrimination based on his race, color and perceived national origin, and thus, was engaging in a protected activity pursuant to Title VI.

142.    CUNY knew or should have known of the unlawful acts and practices yet acted with deliberate indifference and/or reckless disregard for Plaintiff's rights, and failed to act promptly to prevent or end the harassment and discrimination CUNY.

143.    Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by

failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that he suffered and the hostile work environment that was created thereby. CUNY, then forced Plaintiff to take leave, demoted him and subjected him to an antagonistic and inhospitable work assignment as retaliation for making complaints opposing violations of violations of federally protected rights, in violation of Title VI.

144.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

145.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### SEVENTH CLAIM FOR RELIEF

**[*as against CUNY*]**

**[Sex/Gender Expression and Perceived Sexual Orientation
Discrimination in Violation of Title IX]**

146.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

147.    Plaintiff is a man and is thus a member of a protected class under Title IX based on his sex/gender expression and perceived sexual orientation.

148.    CUNY's conduct, as alleged at length herein, constitutes unlawful discrimination against Rias on the basis of his sex/gender expression and perceived sexual orientation.

149.    The stated reasons for CUNY's conduct, if any, were not true, but were instead a pretext proffered to disguise CUNY's discriminatory animus.

150.    CUNY knew that its actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutory rights.

151.    As a direct and proximate result of CUNY's conduct in violation of Title IX, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

152.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## EIGHTH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Hostile Work Environment Based on Violation of Title IX]

153.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

154.    Pursuant to the unlawful acts and practices of CUNY as alleged above, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of his work environment during his employment with CUNY.

155.    CUNY knew or should have known of the unlawful acts and practices, as alleged *supra*, and the hostile work environment created thereby, yet failed to act promptly to prevent or end the harassment and discrimination, in violation of Title IX.

156.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

157.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## NINETH CLAIM FOR RELIEF

### [*as against CUNY*]

### [Retaliation in Violation of Title IX]

158.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

159.    Pursuant to the acts and practices of CUNY as alleged above, Plaintiff made several complaints to his supervisors and to CUNY's HR staff, of the discrimination based on his sex/gender expression and perceived sexual orientation, and thus was engaging in a protected activity pursuant to Title IX.

160.    CUNY knew or should have known of the unlawful acts and practices as the same, yet failed to act promptly to prevent or end the harassment and discrimination.

29

161.    Instead of taking steps to ensure a discrimination-free workplace, CUNY condoned and reinforced the unlawful acts and practices as alleged above and retaliated against Plaintiff by failing to promptly implement corrective measures and/or failing to offer an appropriate resolution to the discrimination that he suffered and the hostile work environment that was created thereby. CUNY, then forced Plaintiff to take leave, demoted him and subjected him to an antagonistic and inhospitable work assignment as retaliation for making complaints about discrimination, in violation of Title IX.

162.    As a proximate result of CUNY's unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

163.    CUNY acted with malice and/or reckless disregard of Plaintiff's statutorily protected civil rights, and, as such, CUNY should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

### TENTH CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Race, Color and Perceived National Origin Discrimination in Violation of Section 1981]**

164.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

165.    The Individual Defendants, in their individual capacities, discriminated against Rias on the basis of his race, color and perceived national origin, thus depriving Rias of rights, privileges, and other beneficial terms of his employment, in violation of Section 1981.

166.    As a direct and proximate result of Individual Defendants' discriminatory conduct described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

167.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## ELEVENTH CLAIMF FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Hostile Work Environment Based on Violation of Section 1981]**

168.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

169.    By the discriminatory acts and practices of the Individual Defendants in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of his work environment during his employment with CUNY.

170.    As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial

losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

171.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## TWELVETH CLAIM FOR RELIEF

### [*as against the Individual Defendants, in their individual capacities*]

### [Retaliation in Violation of Section 1981]

172.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

173.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against plaintiff for his opposition to conduct that violated his rights and privileges in his employment in violation of Section1981.

174.    As a proximate result of the Individual Defendants' retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

175.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## THIRTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Race, Color and Perceived National Origin Discrimination in Violation of Section 1983]

176.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

177.    The Individual Defendants, in their individual capacities, acting under color of law, custom or usage, discriminated against Rias on the basis of his race, color and perceived national origin, thus depriving Rias of rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

178.    As a direct and proximate result of Individual Defendants' discriminatory acts described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

179.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FOURTEENTH CLAIMF FOR RELIEF

### [*as against the Individual Defendants*]

### [Hostile Work Environment under Section 1983]

180.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

181.    By the discriminatory acts and practices of the Individual Defendants acting under color of law, custom or usage, in their individual capacities as alleged herein, Plaintiff was subjected to an abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter and negatively impact the conditions of his work environment during his employment with CUNY, depriving Rias of rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

182.    As a proximate result of the Individual Defendants' discriminatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

183.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges, as protected by federal law, and as such, should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## FIFHTHTEENTH CLAIM FOR RELIEF

[*as against the Individual Defendants*]

### Retaliation under Section 1983

184.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

185.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, under color of law custom or usage, have retaliated against plaintiff for his opposition to conduct that violated his rights under the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, in violation of Section 1983.

186.    As a proximate result of the Individual Defendants' retaliatory acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

187.    The Individual Defendants acted with malice and/or reckless disregard of Plaintiff's rights and privileges protected by federal law, and, as such, they should be subjected to punitive damages to deter future unlawful conduct similar to the conduct alleged herein.

## SIXTEENTH CLAIM FOR RELIEF

[*as against the Individual Defendants in their individual capacities*]

**[Race, Color, Perceived National Origin, Sex/Gender Expression, Familial Status and Perceived Sexual Orientation Discrimination in Violation of Executive Law]**

188.   Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

189.   The Plaintiff is an unmarried man of African-American and Hispanic descent and is thus a member of a protected class under the Executive Law based on his race, color, perceived national origin, sex/gender expression, familial status and perceived sexual orientation.

190.   By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the Executive Law, by taking adverse action against Plaintiff directly because of his race, color, perceived national origin, sex/gender expression, familial status and perceived sexual orientation and aided and abetted CUNY in discriminating against Plaintiff.

191.   As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the Executive Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## SEVENTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Hostile Work Environment Based on Race, Ethnicity, Gender/Gender Expression, Familial Status and Perceived Sexual Orientation in Violation of the Executive Law]

192.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

193.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to, and aided and abetted CUNY in subjecting Plaintiff to, a hostile and abusive workplace permeated with harassment and discrimination that was sufficiently severe or pervasive, so as to alter the conditions of his work environment during his employment with CUNY, in violation of the Executive Law.

194.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## EIGHTEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Retaliation in Violation of Executive Law]

195.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

196.    By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of his employment, including by creating a hostile work environment and aided and abetted CUNY in its retaliation against Rias for his protected activity, in violation of the Executive Law.

197.    As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

## NINETEENTH CLAIM FOR RELIEF

### [*as against the Individual Defendants in their individual capacities*]

### [Race, Color, Perceived National Origin, Sex/Gender Expression, Familial Status and Perceived Sexual Orientation Discrimination in Violation of the City Law]

198.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

199.    The Plaintiff is an unmarried man of African-American and Hispanic descent and is thus a member of a protected class under the City Law based on his race, color, perceived national origin, sex/gender expression, familial status and perceived sexual orientation.

200.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, discriminated against Plaintiff, in violation of the City Law, by taking adverse action against Plaintiff directly because of his race, color, perceived national origin,

sex/gender expression, familial status and perceived sexual orientation and aided and abetted CUNY in discriminating against Plaintiff.

201.    As a proximate result of the Individual Defendants' unlawful acts and practices in violation of the City Law, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

202.    The Individual Defendants' unlawful conduct amounts to either willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

### <u>TWENTIETH CLAIM FOR RELIEF</u>

[*as against the Individual Defendants in their individual capacities*]

**[Hostile Work Environment Based on Race, Color, Perceived National Origin, Sex/Gender Expression, Familial Status and Perceived Sexual Orientation in Violation of the City Law]**

203.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

204.    By the actions described *supra*, among others, the Individual Defendants, in their individual capacities, subjected Plaintiff to, and aided and abetted CUNY in subjecting Plaintiff to, a hostile and abusive workplace permeated with harassment and discrimination that was

sufficiently severe or pervasive, so as to alter the conditions of his work environment during his employment with CUNY, in violation of the City Law.

205.   As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

206.   Defendant's conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## TWENTY-FIRST CLAIM FOR RELIEF

**[*as against the Individual Defendants in their individual capacities*]**

**[Retaliation in Violation of the City Law]**

207.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

208.   By the acts and practices alleged *supra*, the Individual Defendants, in their individual capacities, have retaliated against Plaintiff in the terms and conditions of his employment, including by creating a hostile work environment and aided and abetted CUNY in its retaliation against Rias for his protected activity, in violation of the City Law.

209.   As a proximate result of the Individual Defendants' unlawful acts and practices as described *supra*, Plaintiff has suffered and continues to suffer irreparable injury and substantial

losses, including lost earnings and other employment benefits, and is entitled to monetary and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation, stress and anxiety, physical illness, emotional pain and suffering, severe and lasting embarrassment, loss of reputation, and other compensable damage, and will continue to do so unless and until this Court grants relief.

210. The Individual Defendants' conduct amounts to either, willful or wanton negligence, recklessness, a conscious disregard of the rights of others, and/or conduct so reckless, as to amount to such disregard, in violation of the City Law, for which Plaintiff is entitled to an award of punitive damages to deter future unlawful conduct, similar to the conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectively request that this Court enter a judgment providing the following relief:

a)       A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, State of New York and the City of New York;

b)       An injunction and order permanently restraining Defendants, their partners, officers, owners, agents, successors, heirs, employees, assigns and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c)       Directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment, including restoring positions and duties to Plaintiff that have been taken away, and granting him tenure;

d)      An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, and other benefits of employment;

e)      An award of damages against Defendants in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, physical illness, emotional pain and suffering, and emotional distress;

f)      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, lost income, reputational harm, and harm to professional reputation, in an amount to be determined at trial;

g)      An award of punitive damages in an amount to be determined at trial;

h)      Liquidated damages in an amount to be determined at trial;

i)      Prejudgment interest on all amounts due;

j)      An award of costs that Plaintiff has incurred in this action, including, but not limited costs of expert witnesses and reasonable attorneys' fees and costs to the fullest extent permitted by law; and

k)      Such other and further relief as the Court may deem just and proper;

## DEMAND FOR A TRIAL BY JUR Y

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

in this action.


Dated: Dated:  August 9, 2018
        New York, New York

                                        JASPER & JASPER, PLLC


                                        BY: /s/ Zoë E. Jasper_____
                                            Zoë E. Jasper
                                            zoe@jasperpllc.com
                                        375 Park Avenue; Suite 2607
                                        New York, New York 10152
                                        212.634.9949
                                        *Counsel to Plaintiff*